```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```
_____

CAROL SCHEG, formerly known as Carol Culotta

               Plaintiff,               05-CV-6533

v.                                               **DECISION**
                                               **and ORDER**

JO ANNE BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____

## INTRODUCTION

Plaintiff, Carol Scheg ("plaintiff" or "Scheg"), filed this action seeking review of a final decision by the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). Jurisdiction to review the Commissioner's decision arises under 42 U.S.C. § 405(g). On October 7, 2005 the plaintiff moved for judgment on the pleadings. On June 6, 2006, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the Commissioner moved for judgment on the pleadings affirming her final decision that the plaintiff was not eligible for SSI.

For the reasons that follow, this Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, the defendant's motion for judgment on the pleadings is granted.

PROCEDURAL HISTORY

Scheg allegedly became disabled on May 24, 1998 due to neck and back pain, arthritis, and an organic mental disorder (Tr. 22)[1]. On April 30, 2002, Scheg filed an application for SSI (Tr. 68-72). Her claim was initially denied (Tr. 34-35) and Scheg requested a hearing before an Administrative Law Judge (ALJ) (Tr. 38-40). A hearing was held on May 17, 2004 in Rochester, NY (Tr. 258-291). The ALJ subsequently denied her claim on July 22, 2004 (Tr. 18-31). Scheg's request for a review of the ALJ's decision was denied (Tr. 9-12). She filed this action on October 7, 2005 appealing the ALJ's decision pursuant to 42 U.S.C. § 405(g).

BACKGROUND

A. Non-Medical Evidence and Hearing Testimony

Carol Scheg was born on December 14, 1962 and is a 43 year old divorced mother of five (Tr. 263, 277). Scheg was separated from her husband in August of 2000 because of domestic violence (Tr. 263-264). On that occasion, her husband smashed her head into the wall, injured her neck and back and she sustained a concussion and whiplash (Tr. 264). A similar episode of domestic violence occurred on May 24, 1998, which is the date Scheg alleges her disability began (Tr. 140). Scheg was also involved in a motor

---

[1] All citations "Tr." refer to the Transcript of the Administrative Record submitted to the Court as part of the defendant's Answer which include, *inter alia*, plaintiff's medical records, a transcript of the hearing before the ALJ and copies of the ALJ's decision denying plaintiff SSI.

2

vehicle accident on February 28, 2002, which aggravated her previous symptoms (Tr. 236, 266, 285). She is able to do most activities of daily living, including cooking, cleaning, laundry and grocery shopping, but she needs her children to help with any heavy lifting, pushing or pulling (Tr. 167, 172, 265, 274-275). Scheg has a high school education and also completed one year of cosmetology school (Tr. 91, 277). She has worked as a self-employed hairdresser out of her home since 1981 (Tr. 261-262). She worked full time from 1981 until 2000 but after the car accident in 2002, she found she was only able to work about 10 hours per week due to head pain and trouble reaching above her head, and when twisting and turning (Tr. 262, 267). She also worked as a home health care aide from 2000-2002 (Tr. 128). Scheg attended one year of nursing school from 2001-2002 through Vocational and Educational Services for Individuals with Disabilities (VESID) and Safe Journey but was unable to complete the program due to her inability to satisfy the lifting requirement (Tr. 160, 205, 267-268). She continues to express an interest in completing nursing school but no school will accept her due to her lifting limitations (Tr. 213-214).

    B. <u>Medical Evidence</u>

    Scheg's disability allegedly began on May 24, 1998. On that day, her husband had been drinking and, after an argument, struck her on the left side of her head and then hit her which caused her

3

to fall to the ground twice and temporarily lose consciousness. Her husband struck her in the head a second time later that night. Scheg did not go to the hospital but instead saw her primary care physician, Dr. Janine Daly, three days after the assault. Dr. Daly advised Scheg to take Tylenol or Advil and to apply heat to the affected area. She also gave her the telephone numbers for support groups for battered women and strongly encouraged her to seek help (Tr. 140). Ten days after the incident Scheg was "feeling better." (Id.)

Scheg's husband assaulted her again in August of 2000. Once again she did not go to the hospital but instead saw her primary care physician, Dr. Joseph Kurnath. He advised her to remove herself from her situation (Tr. 281) and also referred her to a chiropractor, Dr. Scott Coykendall. Dr. Coykendall diagnosed Scheg with a whiplash type of injury to her upper thoracic and cervical spine and felt that "her response to care is favorable" (Tr. 146).

Scheg began receiving services from Safe Journey on November 28, 2000. Safe Journey is a transitional program for survivors of domestic violence and provides services such as case management, individual and group counseling, housing and legal advocacy, career mentoring and financial assistance (Tr. 160). Scheg also began seeing a social worker in June of 2001 for individual counseling focusing on issues of domestic violence (Tr. 147) and also received services from VESID. Because Scheg expressed an interest in

4

attending nursing school, Mr. Randy Lincoln, her VESID counselor, arranged for her to receive a neuropsychological evaluation to assess her cognitive and emotional status and to make recommendations as to her ability to attend nursing school (Tr. 148).

In September of 2001 Dr. Peter Sorman, Ph.D. performd a neuropsychological evaluation of Scheg.  He noted that Scheg was taking BuSpar for anxiety, Prevacid for heartburn, Relafen for pain and Claritin for allergies.  He found that Scheg was of average general intelligence, with average concentration, memory, reading and spelling skills and low-average math skills.  She had normal visual processing and scanning, but a reduction in strength and speed bilaterally and difficulty tracking speech sounds and rhythmic patterns.  The key findings were that she may have some motor execution difficulties and problematic hearing.  He recommended some accommodations to aid Scheg in a classroom setting, such as tape recording lectures, providing a note-taker, allowing extra time on examinations, and sitting towards the front of the class.  He also recommended continuing treatment for her head pain and muscular dysfunction (Tr. 148-152).

Scheg enrolled in a nursing program in August, 2001 (Tr. 160). On February 28, 2002 Scheg was rear-ended in a car accident in the Rochester General Hospital parking lot (Tr. 236).  She saw Dr. Kurnath a week after the accident and again on March 14, 2002,

complaining of worsening left-sided neck and head pain. He noted that the recent accident flared up/worsened her already existing condition and recommended that she continue with chiropractic treatment, massage therapy and Vioxx (Tr. 236). Eleven days later Scheg returned complaining of moderate-to-severe left temporal headaches. Dr. Kurnath ordered a head CT and a cervical MRI (Tr. 235). The head CT was unremarkable (Tr. 141) and the cervical MRI showed normal alignment overall with the exception of minimal scoliosis and a small C6-7 left paracentral disc protrusion (Tr. 142). Despite these lack of clinical findings, Scheg was unable to complete her first year of nursing school because of her inability to satisfy the lifting requirement during clinical study. She was asked to leave the program (Tr. 160).

Dr. James Maxwell, a neurosurgeon, examined Scheg on May 8, 2002 and reviewed her MRI of the cervical spine. He diagnosed whiplash ligamentous damage to the level of the facet joints but found nothing in terms of disc ruptures or stenosis that would explain her lingering pains. Given the normalcy of her neurological examination and the relative normalcy of the MRI, he felt that surgery was not necessary and that continuing conservative treatment would be in order (Tr. 158-159).

Scheg returned to her chiropractor, Dr. Coykendall in May and June of 2002. He felt that Scheg had a permanent chronic degenerative condition in her cervical spine that responds well to

chiropractic treatment. "It does not render her disabled....but she does have a permanent problem" (Tr. 144-145).

On July 12, 2002 psychologist Christine Ransom, Ph.D. performed a consultative psychiatric evaluation on Scheg at the request of the State Agency. Dr. Ransom noted that Scheg's current medications were BuSpar for anxiety, Prevacid for heartburn, Folic Acid as a prenatal vitamin, Claritin for allergies and Ibuprofin, Diazepam (Valium), Vioxx and Hydrocodone APAP for pain. Dr. Ransom concluded that Scheg has borderline intellectual functioning but otherwise no mental disorders. Any difficulties that would limit her ability to function as a hairdresser would be physical problems, not mental ones (Tr. 163-169). Psychologist Michael Moses, Ph.D. agreed with Dr. Ransom in his psychiatric review of Scheg on July 20, 2002. He concluded that Scheg had an organic mental disorder but that her impairments were not severe. He also concluded that she has no functional limitations other than a borderline level of intellectual functioning (Tr. 181-193).

Also on July 12, 2002 Dr. Haritatos performed a consultative internal medicine examination on Scheg at the request of the State Agency. He noted her history of assault and the motor vehicle accident as well as a bunionectomy performed on 6/28/02. Scheg complained of chronic head and neck pain, left-sided pain, weakness and numbness, back pain and vertigo. Physical therapy and chiropractic treatments seemed to help her. Dr. Haritatos noted

that she was able to complete activities of daily living although she relied on her children and friends for help. He concluded that "if she can stay away from being injured or assaulted again, gradually her prognosis should become good...She may be left with still some discogenic disease of the neck, and I would say on that aspect that part may be guarded." He recommended that she should avoid open machinery, heights and driving due to her problems with vertigo and dizziness. Until her foot healed from the bunionectomy she should be restricted from standing, climbing and walking (Tr. 170-176).

On August 22, 2002 Dr. Kurnath examined Scheg and filled out a disability report. In his examination he noted partial improvement in her neck flexion and upper extremity range of motion with physical therapy two times a week along with chiropractic treatments twice a month. Her pain, however, was unchanged from mild-to-moderate. He recommended that she continue with physical therapy and chiropractic treatment and also added Carisoprodol (Soma tablet) to treat her pain (Tr. 139). In his disability report Dr. Kurnath limited her from lifting, carrying, pushing and pulling more than ten pounds and also limited her from performing overhead activities (Tr. 137).

Over the next year Scheg continued with physical therapy and chiropractic treatments. A physical therapy report from September 10, 2002 states that her residual functional capacity is

sedentary with ambulation up to two hours per day (Tr. 195). On October 4, 2002 physical therapy reported that she "has made progress" but was unable to lift more than three or four pounds; progress was likely to continue but would be slow and gradual (Tr. 206). By October 23, 2003 her prognosis was "fair" (Tr. 230) and her last physical therapy report dated November 11, 2003 stated that she was "doing well" and had a 40% decrease in pain (Tr. 229). A chiropractic report from October 16, 2003, however, states that she has a permanent chronic degenerative condition of her upper thoracic spine and cervical spine and that her prognosis is poor (Tr. 227).

A residual functional capacity evaluation completed by a Department of Developmental Services physician on September 11, 2002 concluded that Scheg could frequently lift ten pounds; stand and/or walk at least two hours in an eight hour day; sit a total of six hours in an eight hour day; push and/or pull and unlimited amount; and occasionally climb, stoop, kneel and crawl. She was limited only in reaching and in dealing with hazards, such as heights, operating heavy machinery and driving (Tr. 197-202).

Because Scheg was still expressing a strong desire to return to nursing school but was having difficulty finding a school that would accept her with her lifting limitations, Mr. Lincoln, her VESID counselor stated on October 3, 2002 that she was disabled and that VESID services were in the process of developing a plan for

9

her to return to work (Tr. 203). To that end, a functional capacity evaluation was conducted by Mr. Douglas Seyfried, an occupational therapist, on January 24, 2003. He concluded that Scheg would be able to do sedentary work but would not be able to lift over two pounds and would be limited in the use of her left upper extremity (Tr. 217-219). Ms. Carol Dann, a certified brain injury specialist for VESID, researched many area nursing programs but was unable to find one that did not have a lifting requirement. In March, 2003 she concluded that it was not appropriate for Scheg to return to nursing school. She also felt that Scheg has more in-depth cognitive limitations than are indicated in her medical records and that the combination of her physical and cognitive limitations make her return to work "rather questionable" (Tr. 213-214).

Although Dr. Kurnath noted that Scheg had "good improvement of symptoms" with physical therapy (Tr. 234), her physical therapy was stopped due to length of treatment and she had no further improvement of her symptoms without physical therapy. On December 29, 2003 Dr. Kurnath felt that she should continue to avoid overhead lifting of over ten pounds and recommended sedentary work with occasional positional changes. He also referred her for treatment at the Pain Management Center (Tr. 233).

On February 3, 2004 Scheg received marcaine injections from Dr. Naseer Tahir at the Pain Management Center (Tr. 237-240). The

injections improved her symptoms. On March 9, 2004 Dr. Kurnath refilled her prescription for diazepam (Valium), instructed her to follow up at the pain clinic and referred her back to physical therapy (Tr. 232).

On March 16, 2004 Dr. Kurnath wrote a letter, presumably in preparation for her Social Security Administration hearing, stating that Scheg is "chronically disabled with neck pain. She is unable to work over 20 hours a week of sedentary work due to exacerbation of neck pain, and no more than 10 hours of a non-sedentary employment weekly. She is currently on pain medications and following with a pain center for pain control. The pain is chronic with no expectation of improvement in the future. Restrictions include no pulling, twisting, lifting over 5 pounds, and no prolonged exposure to cold weather. With acute exacerbation of neck pain, patient would be unable to work temporarily" (Tr. 231). When Dr. Kurnath learned that Ms. Scheg was denied long-term disability benefits after her administrative hearing, he wrote another letter, dated September 10, 2004. He reiterated that Scheg's residual functional capacity is lifting and carrying no more than five pounds, standing and/or walking up to half an hour at a time, and sitting up to four hours in an eight-hour work day. He also pointed out that Scheg has been unable to perform and sustain the work levels required even in sedentary jobs and gave a

beautician and a home health care aide as examples of previous employment that she was unable to perform (Tr. 246).

## LEGAL STANDARD

A. <u>Jurisdiction and Scope of Review</u>

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims on the denial of Social Security benefits.  When considering a claim, the Court must accept the findings of fact made by the Commissioner provided that such findings are supported by substantial evidence in the record.  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938).

Under this standard, the court's sole inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the law judge." <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982).

B. <u>Legal Standards</u>

The plaintiff maintains that she is entitled to SSI benefits as provided in Title XVI of the Act.  <u>See</u> 42 U.S.C. § 1382(a)(3).  Entitlement to benefits under the Act is conditioned upon compliance with all relevant requirements of the statute.

To be eligible for SSI benefits, a claimant must meet the income and resource limitations of 42 U.S.C. §§ 1382a, 1382b.  A claimant must also demonstrate the inability to engage in a

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).

Furthermore, a claimant is disabled only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B); see 20 C.F.R. § 416.920.

In evaluating disability claims, the Commissioner instructs adjudicators to follow the five step process promulgated in 20 C.F.R. 416.920.  First, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. Second, if the claimant is not so engaged, the Commissioner must determine whether the claimant has a "severe impairment" which significantly limits his ability to work.  Third, if the claimant does suffer such an impairment, the Commissioner must determine whether it corresponds with one of the conditions presumed to be a disability by the Social Security Commission.  If it does, then no further inquiry is made as to age, education or experience and the claimant is presumed to be disabled.  If the impairment is not the equivalent of a condition on the list, the fourth inquiry is

whether the claimant is nevertheless able to perform his past work. If he is not, the fifth and final inquiry is whether the claimant can perform any other work. The burden of proving the first four elements is on the claimant, while the burden of proving the fifth element is on the Commissioner. <u>Bush v. Shalala</u>, 94 F.3d 40, 45 (2d Cir. 1996).

<u>DISCUSSION</u>

Here, the ALJ properly followed the five step procedure. The ALJ found that Scheg: (1) had not engaged in substantial gainful employment at any time since her alleged onset date; (2) suffered from "severe" chronic cervical and thoracic spine pain and chronic anxiety; (3) did not have an impairment meeting or medically equivalent to one of the listed impairments in Appendix 1 of the C.F.R., Subpart P, Regulation No. 4; (4) could not perform any of her past relevant work except on a part-time basis; and (5) showed that there were other jobs in the national economy which Scheg could perform (Tr. 21-31).

The Commissioner contends that because there is substantial evidence in the record to support the ALJ's determination that Scheg is not disabled, her motion for judgment on the pleadings should be granted.

Scheg contends that although the ALJ followed the five step procedure, he improperly concluded that she was not disabled. Scheg contends that the ALJ's decision is flawed in two major

14

respects. First, the ALJ improperly evaluated her chronic anxiety disorder. Second, his consideration and discussion of the medical evidence is incomplete and inaccurate (Tr. 247-248). Therefore, Scheg argues that because the ALJ erred, the determination should be reversed. This Court finds that there is substantial evidence in the record to support the ALJ's determination that Scheg is not disabled.

     The ALJ correctly identified Scheg's primary impairment as her chronic persistent neck pain caused by domestic violence and exacerbated after her car accident on February 28, 2002 (Tr. 26, 236). With regard to her organic mental disorder, Dr. Kurnath diagnosed Scheg with a chronic anxiety disorder (Tr. 133). However, no significant limitations result from this impairment. When she is anxious she has the feeling that her throat is closing up, but her anti-anxiety medication (BuSpar) helps (Tr. 164). Both consultative psychologists Drs. Ransom and Moses agreed that Scheg had a borderline level of intellectual functioning but that her mental impairments were not severe (Tr. 163-169, 181-193). As for her complaint of arthritis, treatment notes referring to "degenerative joint disease/arthritis" are not accompanied by any objective test results, clinical evaluations or other supporting evidence (Tr. 234).

     Treatment for Scheg's chronic persistent neck pain has consistently been conservative. Her x-rays have been negative for

fracture (Tr. 143), the MRI of her cervical spine was relatively normal (Tr. 159) and a CT scan of her head was also unremarkable (Tr. 141). Neurosurgeon Dr. Maxwell felt that, given the normalcy of her neurological examination and the relative normalcy of the MRI, nothing would require surgery and further conservative treatment would be in order (Tr. 159). Scheg's conservative treatments included physical therapy, massage therapy, chiropractic treatments and pain medication (Tr. 139, 172, 232). The chronic degenerative condition in her cervical spine "responds well" to chiropractic treatments and she got some relief (Tr. 145). Scheg also made progress with physical therapy and self-reported that she was doing better (Tr. 206, 229, 230). She also received marcaine injections from Dr. Tahir at the Pain Management Center (Tr. 237-240). Her symptoms improved and she declined a permanent nerve block, preferring to continue with her pain medication (Tr. 232).

The ALJ noted inconsistencies in Dr. Kurnath's most recent report of Scheg's residual functional capacity and properly declined to accord it controlling weight. In August 2002 Dr. Kurnath reported that Scheg could perform sedentary work with limitations on lifting, carrying, pushing and pulling more than ten pounds and limitations on performing overhead activities (Tr. 137). He stated this again in December 2003 (Tr. 233). But less than three months later, in March 2004, presumably in response to a

request by Scheg for Dr. Kurnath to write a letter in preparation for her upcoming Social Security Administration hearing, Dr. Kurnath wrote that Scheg would be unable to perform over twenty hours of sedentary work per week and no more than ten hours of non-sedentary work per week.  He also restricted her pulling and lifting to five pounds (Tr. 231).  There were no changes in Scheg's medical history between December 2003 and March 2004 but rather improvement noted after her treatment at the Pain Management Center (Tr. 232).  A physical therapy report from this time period also indicates that she is "doing better" (Tr. 229).  After the ALJ issued his decision, Dr. Kurnath wrote another, even more restrictive, assessment of Scheg (Tr. 246).  Again, there is no indication in the record of a deterioration in Scheg's condition. The Appeals Council reviewed this assessment and found that the information did not provide a basis for changing the ALJ's decision. 20 C.F.R. § 416.1470(b).

The ALJ properly accorded little weight to Scheg's non-medical sources' reports due to inconsistencies in the medical record. After Scheg was asked to leave her nursing program, Randy Lincoln, a counselor at VESID, reported that she was disabled and that VESID was in the process of developing a plan for her eventual return to work (Tr. 203).  This statement in and of itself indicates that Scheg has the potential to return to work.  Carol Dann, a certified brain injury specialist for VESID, felt that Scheg has more in-

depth cognitive limitations than the medical records indicate and that her return to work is "questionable" (Tr. 213-214). These conclusions, however, are not supported by other acceptable medical evidence. Dr. Coykendall, Scheg's chiropractor, reported in 2002 that he did not feel that Scheg was disabled and that her symptoms responded well to chiropractic treatments (Tr. 144-145). In 2003, however, after no new injury and positive responses to physical therapy, Dr. Coykendall noted that her overall prognosis was poor (Tr. 227). In January 2003 Mr. Seyfried, an occupational therapist, reported that Scheg could not lift over two pounds. However less than four months before Mr. Seyfried's evaluation a DDS physician concluded that Scheg could frequently lift ten pounds (Tr. 198). Also, one year after Mr. Seyfried's evaluation Dr. Kurnath concluded that Scheg could lift ten pounds but should avoid overhead lifting of over ten pounds (Tr. 233).

Accordingly, the ALJ's finding that Scheg retains the residual functional capacity to perform sedentary work with the limitations of lifting and carrying no more than ten pounds, standing and/or walking up to two hours and sitting up to six hours in an eight hour workday is supported by substantial evidence in the record as a whole.

## CONCLUSION

For the reasons set forth, I do find substantial evidence in the record to support the ALJ's conclusion that the plaintiff is

not eligible for SSI.  Accordingly, the Commissioners's motion for judgment on the pleadings is granted.

ALL OF THE ABOVE IS SO ORDERED.

                                       S/Michael A. Telesca
                             _____
                                  MICHAEL A. TELESCA
                             United States District Judge

DATED:   Rochester, New York
         August 1, 2006